In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 07-2758

JOHN WASSON,

*Plaintiff-Appellant,*

*v.*

PEABODY COAL COMPANY,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 4:02-CV-0090—**Sarah Evans Barker**, *Judge.*

_____

ARGUED MAY 16, 2008—DECIDED SEPTEMBER 8, 2008

_____


Before BAUER, POSNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* John Wasson sued Peabody Coal Company for breach of contract, claiming that it underpaid the royalties to which he was entitled for coal mined from his property. After a bifurcated jury trial resulting in a $350,000 verdict in Wasson's favor, the district court granted Peabody's renewed motion for judgment as a matter of law. Wasson appeals, and we affirm.

**I**

Wasson leased coal-mining rights to Peabody (or one of its predecessors-in-interest) in exchange for royalty payments calculated in accordance with a lease agreement. Believing that Peabody had underpaid the royalties due for coal mined from 1996 through January 2000, Wasson filed suit in federal court against Peabody and Indianapolis Power and Light ("IP&L"), alleging antitrust violations. In a more direct effort to collect the additional royalties he claimed, he also raised a breach-of-contract claim against Peabody. In August 2006, the district court granted summary judgment in favor of Peabody and IP&L on the antitrust claims, causing IP&L to be dismissed from the suit. At the same time, it denied Peabody's motion for summary judgment on the breach of contract claim. The court decided to bifurcate the liability and damages stages of the trial, and so it first submitted to the jury the question whether Peabody had breached the agreement. The jury answered yes, and then went on in the second phase to award Wasson damages of $350,000. While this was a substantial sum, it paled in comparison to the nearly $10 million he had requested. Peabody, in the meantime, had asked the court at every available opportunity for judgment as a matter of law. See FED. R. CIV. P. 50. On Peabody's fourth try, the district court granted the motion and reduced the jury's award to $965.62, the amount Peabody acknowledged owing based on its own expert's review of the data.

Distressed to see his victory snatched away from him, Wasson has appealed. He argues that the district court erred in denying his motion for a continuance just prior

to trial (and denying his motion to reconsider that ruling), because, he said, he needed additional time to review recently produced discovery materials. He also asserts that the court erred in barring his expert witness from testifying. Finally, he contends that the court should not have set aside the jury's award of damages, because there was sufficient evidence for a reasonable jury to find in his favor. We address each argument in turn.

**II**

Wasson faces long odds on his first point, given the fact that we review a trial court's denial of a motion for continuance for an abuse of discretion. *Research Sys. Corp. v. IPSOS Publicite*, 276 F.3d 914, 919 (7th Cir. 2002). The parties in this relatively straightforward case have been battling over discovery for years. The supervising magistrate judge actually granted part of Wasson's motion to compel; unable to resist the obvious metaphors, the judge observed that "each side has thrown a little coal sludge into the discovery dispute processing hopper." Wasson complains nevertheless that when making boxes filled with papers available to him in which he could find the data he needed, Peabody did not furnish enough detail about the precise location of the requested records. Wasson was partly to blame for this, however, because his interrogatories were very broad in scope. In an effort to home in on the central issues, the magistrate judge asked Wasson what he was really looking for; Wasson responded that he was trying to substantiate the "Mancil Robinson Report," a summary of royalties that he had

received from Peabody years earlier when he first disputed its payments. Consequently, the magistrate judge ordered Peabody to "file supplemental answers to Interrogatory Nos. 8 and 28 based upon The Mancel-Robinson [*sic*] Report and all underlying documentation used in producing that report."

As Peabody points out, this order may have expanded the original interrogatories. For example, Interrogatory No. 28 requested production of "all data and information used to calculate any and all royalty payments." The question did not mention or allude to the Mancil Robinson Report at all. In fact, Peabody asserts, it did not use the Mancil Robinson Report to calculate royalty payments. Thus, while there was substantial (perhaps overwhelming) overlap among the documents responsive to the interrogatory as originally framed and as recast in the magistrate judge's order, it was foreseeable—in fact, likely—that the documents that were responsive to the two questions would not be identical. This explains the presence of "new" documents produced shortly before trial in response to the motion to compel. (Although Peabody did not cross-appeal based on the magistrate judge's arguable expansion of the scope of the interrogatory, the difference between the original demand and the order is relevant to the question whether Peabody was playing foul with Wasson by producing new documents shortly before trial.) In any event, Wasson had ample time to review the documents in the original production to determine whether additional discovery was necessary before the expiration of the discovery deadline, but he chose to sit on the matter.

Wasson cannot meet the standard for reversal on this ground because he cannot show that he suffered "changed circumstances to which a party cannot reasonably be expected to adjust without an extension of time." *N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 269 (7th Cir. 1986). Moreover, we agree with the district court's description of Wasson's strategy in disputing and redisputing this discovery issue:

> We find it telling that in Wasson's responsive brief to Peabody's post-trial motion [for judgment as a matter of law] he does not identify any specific evidence introduced at trial which would support the jury's verdicts. Rather, his largely non-responsive rehash of long-ago-resolved discovery disputes demonstrates Wasson's continued preoccupation with finding a "smoking gun" in hopes of substantiating his theories about the alleged but unproven wrongs Peabody visited upon him.

This court has emphasized that "district judges must be allowed considerable leeway in scheduling civil cases, and therefore in denying continuances that would disrupt their schedules . . . ." *Research Sys. Corp. v. IPSOS Publicite*, 276 F.3d at 920. In this case, which was filed over five years ago, the denial of a continuance was not an abuse of discretion.

## III

We also review the district court's evidentiary rulings only for abuse of discretion, and we "will not reverse unless the record contains no evidence upon which the

trial judge rationally could have based his decision." *United States v. Savage*, 505 F.3d 754, 760 (7th Cir. 2007). To support his breach of contract claim, Wasson attempted to introduce the expert testimony of Robert Swan, his accountant, although the theory underlying Swan's expert witness report was actually Wasson's. The report asserted that the coal price Peabody was using to calculate Wasson's royalties was too low. This conclusion was based on the difference between the "average gross invoice sales price" used by Peabody when calculating royalties for August 1999 and the fuel cost data reported for that same month by IP&L, one of Peabody's customers, to the Federal Energy Regulatory Commission ("FERC").

The district court based its decision to exclude this testimony on several critical shortcomings. First, the analysis included only a single Peabody customer. (Even if it had included all the FERC reports filed, non-utility customers are not required to file FERC reports, and so the data would still have been incomplete.) Moreover, the figures for a month from this one customer were extrapolated to arrive at a number supposedly representing *twenty years* of alleged underpayment. (Even before sending the case to the jury, the district court reduced the claim period to five years, in keeping with the statute of limitations.) Peabody's expert witness, an economist, testified that Swan's extrapolation did "not meet scientific standards for use of mathematical statistics." Finally, Swan admitted that he had never previously seen or worked with a FERC report, did not know what items were included or excluded in the fuel cost data found in such reports, and was unaware of any occasion where some-

one else had used FERC data to test the accuracy of a royalty payment.

We have no trouble endorsing the district court's decision to exclude Swan's testimony—indeed, had the court admitted it, we would probably have reversed that decision for an abuse of discretion. Swan's opinion was not "based upon sufficient facts or data," nor was it "the product of reliable principles and methods," as required by FED. R. EVID. 702.

**IV**

Finally, we give *de novo* review to a district court's grant of judgment as a matter of law. *Castellano v. Wal-Mart Stores, Inc.*, 373 F.3d 817, 819 (7th Cir. 2004). We agree with the district court that the jury's damages award must be set aside because it was based on nothing but speculation. Wasson says that this is not so, because his trial exhibit 100 thoroughly summarized his evidence on damages. But a review of this exhibit only reveals all the problems that so concerned the district court. The exhibit is nothing more than Wasson's scratch-paper work-up of his guess at determining his damages. For example, when Wasson could not find the number of "barge" tons mined during the relevant periods, he simply copied the number of "rail" tons mined into his "barge" tally. Absolutely nothing suggests that the two numbers were necessarily the same.

It seems that there were no barge tons accounted for in the Mancil Robinson Report because the barge tons and the rail tons were erroneously lumped together to

produce the number shown for rail tons. The difference matters: royalties for barge tons are slightly higher than those for rail tons. This lumping of both kinds of shipment into the rail category resulted in the $965.62 underpayment that Peabody's expert witness discovered and that Peabody thereafter conceded owing. In addition, Wasson also used an absurdly high coal price for all his calculations, $107.26 per ton, simply because he found one entry for one month among Peabody's documents showing that price. The prevailing price for all the periods in question was almost an order of magnitude lower, hovering around $18 or $19 per ton. The $107 per ton price turned out to be an accounting artifact arising from a "quality adjustment" for a particular buyer on a particular occasion.

The district court held that it could "identify no reasonable basis in the evidence for the jury's $350,000 damage award to Mr. Wasson." Neither can we. The judgment of the district court is AFFIRMED.