# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1009

_____

Kristen Brown; A.B., by next friend Kristen Brown; R.B., by next friend Kristen Brown

*Plaintiffs - Appellees*

v.

Kenneth L. Davis, Jr.

*Defendant*

William Davis; William Davis Logging, Inc.

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: December 15, 2015
Filed: February 23, 2016

_____

Before MURPHY, BENTON, and KELLY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Kyle Brown was killed on a bridge crossing the Mississippi River between Missouri and Illinois when a large "log skidder" tractor fell off a truck onto his car.

The truck hauling the log skidder was being driven by Kenneth Davis, Jr. (Ken) for his uncle William Davis and William Davis Logging, Inc. (WDL). Brown's wife Kristen brought this wrongful death action against Ken Davis, William Davis, and WDL on behalf of herself and her two children. The complaint asserted negligence based on Ken's driving and William's failure to block oncoming traffic. After the case was removed to federal court,[1] it was tried before a jury which returned a $3 million verdict for the Browns. William Davis and WDL appeal. We affirm.

I.

On December 14, 2011 William Davis, the president of WDL, and his nephew Ken Davis, an independent contractor, set out from Atlas, Illinois to deliver a John Deere 540B log skidder owned by WDL to a buyer in Eolia, Missouri. In order to reach Eolia, the Davises planned to travel west across the Mississippi on the Champ Clark Bridge. That bridge is 20 feet wide and has two lanes. Since the log skidder was 10 feet wide, it would have had to cross the centerline and encroach on the eastbound lane of the bridge.

At trial Sheriff Paul Petty of Pike County, Illinois testified about a 20 year local practice for wide loads crossing the bridge. According to the sheriff, the practice was for a driver with a wide load to call a law enforcement agent and request that all oncoming bridge traffic be stopped. Although Ken was aware of this practice, he preferred to "close" the bridge himself by sending another driver across first to block the eastbound lane. Ken testified that he had hauled loads across the bridge for William "thousands" of times. Often William was with him and would cross first in his pickup truck to close the lane until Ken and his load were safely across to the west. Ken stated that William had closed the bridge for him hundreds of times.

---

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri, presiding.

William also testified that he had blocked traffic on the bridge himself and sometimes had called law enforcement to close it.

At the west end of the bridge where plaintiffs allege William Davis was supposed to block traffic there is a four way stop at the first intersection. There are two gas stations on the eastern corners of that intersection, and between them and the west end of the bridge is a motel. A driver heading east from either gas station or the motel may turn directly onto the road which leads to the bridge and avoid the four way stop at the intersection. Because of these access points on the west side of the bridge, William would be ideally positioned close enough to the bridge to block oncoming vehicles either from the intersection or from the three adjacent properties. The day before the accident, Ken loaded the log skidder onto a flatbed trailer for William who owned both the trailer and the truck.

The next morning the two met for breakfast at the Atlas Cafe, then went to Ken's lot, checked the trailer, and set off westbound for Missouri. William went first in the pickup. Ken followed with the log skidder and slowed as he approached the east end of the bridge and drove onto the shoulder to call William to check on any traffic. After William assured Ken that "the bridge was clear" and hung up, Ken drove west. As Ken passed under the first part of the bridge superstructure, he saw a car coming east over a rise in the center of the bridge. He "tried to move over because [it] was coming at [him] real quick," but he "got over too far" and hit the bridge with the log skidder. On impact the skidder ripped loose from the trailer and struck the top of the oncoming car, killing its driver, Kyle Brown. The collision occurred on the Illinois side of the bridge about 500 feet east of its center.

Ken Davis admitted that his negligence had caused the accident resulting in Brown's death so the key contested issue for the jury related to William's actions on the Missouri side of the bridge. Both William and another witness, Richard Brummell, testified about William's location, using an aerial photograph of the scene

to explain to the jury what happened. William testified that as he headed west over the bridge toward Missouri, Ken called and asked him "to look out for trucks." William responded that "it's all clear." Then when William reached the Missouri side of the bridge, he stopped "a few car lengths" before the stop sign at the intersection ahead and "sat there for a few minutes" watching for oncoming traffic. William admitted at trial that from that location he would "probably not" have been able to stop traffic entering onto the road from the motel parking lot or the two gas stations closer to the bridge.

When William saw Richard Brummell's pickup truck approaching the Missouri intersection, he "told [Brummell] that Ken was coming across the bridge with a wide load." Brummell then stopped and waited. While he was waiting at the intersection, William looked in his rearview mirror and "could see the super structure of [the] truck . . . coming across the bridge." Later, however, he stated that he could have been mistaken about whether he had in fact seen it. After he stopped Brummell, William said he "saw no traffic." Apparently he believed Ken could safely proceed over the bridge at that point. William then crossed to the west side of the intersection to use the restroom in the Shell station. As he walked into the station, Ken called and said that there had been an accident.

Richard Brummell's testimony was different in significant points. He explained that as he was driving east from Missouri to his farm in Illinois, he first saw William when they were both approaching the intersection at the west end of the bridge. Brummell testified that instead of waiting at the intersection to block traffic, William had proceeded through the crossing "just like you do at a normal stop sign" and gone over to the Shell station. Brummell did not see William give any signal for him to wait and "didn't see nobody stop anybody." Brummell continued onto the bridge and came to the scene of the accident where he saw Ken standing next to his truck calling for help on his cell phone. At point Brummell backed up to the Missouri end of

the bridge in order to block traffic coming from the two gas stations or the motel. Brummell did not see Kyle Brown's car prior to the accident.

Kyle's wife Kristen Brown filed a wrongful death action in state court which was subsequently removed to the United States District Court for the Eastern District of Missouri, see 28 U.S.C. §§ 1332(a), 1441(a). The case was tried to a jury which found in favor of Brown and her children. Damages of $3,000,000 were assessed against Ken, William, and WDL jointly and severally. After trial William and WDL filed a motion for judgment as a matter of law, claiming that there had been insufficient evidence to find William individually liable and that the WDL company was entitled to judgment on the vicarious liability claims. See Fed. R. Civ. P. 50. The district court concluded that there was sufficient evidence for the jury to find that William Davis was negligent and liable for Kyle Brown's death, and WDL also responsible for William's negligence. William and WDL now appeal.

II.

Appellants contend that the district court erred by denying their motion for judgment as a matter of law because there was insufficient evidence that William was negligent. We review de novo the denial of such a motion. Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co., 381 F.3d 811, 818 (8th Cir. 2004). We view the evidence "in the light most favorable to the verdict, giving the prevailing party the benefit of all reasonable inferences, and we will not judge the credibility of the witnesses or weigh the evidence." Id. (citation omitted). We will not set aside the jury verdict "unless there is a complete absence of probative facts to support the verdict." Id.

The collision which killed Kyle Brown occurred east of the boundary between Missouri and Illinois at the middle of the main channel of the Mississippi River. See 3 Stat. 545 (1820) (delineating the boundary). William's actions on the west end of

the bridge occurred in Missouri. The district court had jurisdiction based on the diversity of the parties and applied Missouri tort law under Missouri's choice of law principles. See Am. Guar. & Liab. Ins. Co. v. U.S. Fid. & Guar. Co., 668 F.3d 991, 996 (8th Cir. 2012). No party has challenged that determination, and we also apply Missouri tort law. See Lackawanna Chapter of the Ry. & Locomotive Historical Soc'y, Inc. v. St. Louis Cty., 497 F.3d 832, 835 (8th Cir. 2007). See generally Gerhard v. Terminal R.R. Ass'n of St. Louis, 299 S.W.2d 866, 869–70 (Mo. 1957) (per curiam) (discussing Missouri's concurrent jurisdiction "on the river Mississippi" as applied to cases involving bridges).

To prove a claim of negligence under Missouri law, "a plaintiff must establish that the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused injury to the plaintiff." Lesch v. United States, 612 F.3d 975, 981 (8th Cir. 2010) (citing Lopez v. Three Rivers Elec. Co-op., 26 S.W.3d 151, 155 (Mo. 2000)).

## A.

Appellants first argue that the Browns did not present sufficient evidence to establish that William had a legal duty. "The duty to exercise care may be a duty imposed by common law under the circumstances of a given case." Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc./Special Prods., Inc., 700 S.W.2d 426, 431 (Mo. 1985) (quoting Zuber v. Clarkson Constr. Co., 251 S.W.2d 52, 55 (Mo. 1952)). The extent of a duty "is generally measured by 'whether or not a reasonably prudent person would have anticipated danger and provided against it.'" Id. (quoting Scheibel v. Hillis, 531 S.W.2d 285, 288 (Mo. 1976)). The "paramount factor" in determining whether a duty exists is the foreseeability that some injury might result. Id. Whether the defendant "should have foreseen a risk in a given set of circumstances" depends on whether there was "some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it." Lopez, 26 S.W.3d at 156.

-6-

There was ample evidence in the record for the jury to find that William should have foreseen the risks of transporting the log skidder across the bridge without first stopping traffic and that ordinary persons would have taken some precautions. An ordinary person would know that truckers must take special measures when hauling wide loads, especially on narrow roads. It would have appeared to a reasonably prudent person that the 10 foot wide log skidder required both of the two lanes in order to pass safely across the narrow Champ Clark Bridge. Given the risk of a collision, an ordinary reasonable person would have either called law enforcement to close the bridge from other traffic or blocked it himself. In fact, the normal practice for William and Ken was to close the bridge before crossing with a wide load. On this record, moreover, the evidence indicated that William directed each stage of the move and his role was to stop traffic during the bridge crossing and inform Ken once the bridge was clear. The record was sufficient to prove that William had a duty to take precautions against the risks involved in transporting the log skidder over the bridge.

Appellants argue however that William had no legal duty because he did not "gratuitously and voluntarily undertake" a duty to Kyle Brown. They cite the Restatement (Second) of Torts § 323 which imposes liability on a person "who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things." See Trader v. Blanz, 937 S.W.2d 325, 328 (Mo. Ct. App. 1996). Section 323 of the Restatement is not applicable to this case, however. The jury found that William agreed to "participate in the process of transporting the log skidder over the Champ Clark bridge," that he failed to stop oncoming traffic or to properly advise Ken of oncoming traffic, and that he was thereby negligent. In this case, William's legal duty arose because a reasonably prudent person would have anticipated danger under

the circumstances and provided against it, <u>Hoover's Dairy, Inc.</u>, 700 S.W.2d at 431 (Mo. 1985), not because he was "render[ing] services" to Kyle Brown.

The district court used the language of a liability element under section 323 in one of its instructions, asking the jury to determine whether William's negligence "increased the risk of harm." <u>See</u> Restatement (Second) of Torts § 323 (1965). This was not however a "gratuitous undertaking" case. The district court added that element "to accommodate a belief by [William] that this would be some action that he is undertaking voluntarily," but it explained that the jury could find William liable even if he "was not performing in a gratuitous manner." Appellants' objections to the jury instructions were denied, and the jury was never asked to determine whether William undertook to "render services" to Kyle Brown. The district court correctly instructed on general negligence principles, and there was sufficient evidence for the jury to find that William had a legal duty to take appropriate precautions.

## B.

Appellants next argue that there was insufficient evidence for the jury to find that William breached his duty of care. The district court properly instructed the jury to determine whether William failed to use "the degree of care that an ordinarily careful person would use under the same or similar circumstances." <u>See</u> <u>Lopez</u>, 26 S.W.3d at 158. There was ample evidence to support the jury's finding that William failed to use ordinary care. Sheriff Petty's testimony showed that closing the bridge was an ordinary practice in the community. <u>See</u> <u>Wright v. Chicago, Burlington & Quincy R.R. Co.</u>, 392 S.W.2d 401, 405 (Mo. 1965) (discussing the relevance of evidence of custom in determining what an ordinarily prudent person would do under the circumstances). William knew about the crossing procedure because on prior occasions he had called law enforcement to close the bridge or blocked the bridge himself. Ken testified that William had blocked the bridge hundreds of times when

WDL was transporting wide loads. Brummell's testimony, viewed in the light most favorable to the verdict, showed that on this record William did not warn others to stop. Instead of blocking traffic, William went to the Shell station. William testified that he called Ken and told him the bridge was "all clear" although he did not know in fact if it was.

Appellants point to William's testimony about what he agreed to do the day of the bridge crossing, but the jury apparently believed Brummell's version of the facts, and we cannot reweigh the evidence or the jury's credibility findings. Conseco Fin. Servicing Corp., 381 F.3d at 818. Moreover, William's own testimony showed that even if he did in fact stop and wait, he did so in a position that would not have prevented cars leaving the motel from turning on to the bridge. He therefore was not in a position to block traffic adequately. "Maybe I was a little too far forward," William admitted. We conclude that the evidence of his failure to stop traffic and of his misleading signal to Ken was sufficient for the jury to find that William failed to exercise ordinary care.

C.

Appellants also argue that William's actions were not the proximate cause of Kyle Brown's death. The general test for proximate cause "is whether an injury is the natural and probable consequence of the defendant's negligence." Stanley v. City of Independence, 995 S.W.2d 485, 488 (Mo. 1999). Proximate cause "inquires into the scope of foreseeable risk created by the defendant's act or omission." Nail v. Husch Blackwell Sanders, LLP, 436 S.W.3d 556, 563 (Mo. 2014). In this context, "foreseeability refers to whether a defendant could have anticipated a particular chain of events that resulted in injury or the scope of the risk that the defendant should have foreseen." Lopez, 26 S.W.3d at 156. The defendant need not have anticipated the "exact manner" in which a particular injury would occur. Callahan v. Cardinal

Glennon Hosp., 863 S.W.2d 852, 865 (Mo. 1993) (quoting Tharp v. Monsees, 327 S.W.2d 889, 894 (Mo. 1959)). Rather, the plaintiff must prove that the defendant "could foresee the person who would be injured" and that he "knew or ought to have known that there was an appreciable chance some injury would result." Id. (quoting Tharp, 327 S.W.2d at 894).

Viewed in the light most favorable to the verdict, the evidence was sufficient for the jury to find that William's actions were the proximate cause of the accident. Had William blocked traffic from entering the bridge, as an ordinarily careful person would have done, Kyle Brown's car would not have been on the bridge at the same time as the truck carrying the log skidder. William knew that any person driving onto the bridge might be at risk and should have foreseen the risk of a collision.

Appellants nonetheless assert that Ken's negligent driving on the bridge was the sole proximate cause of the accident. When two or more persons commit successive acts of negligence, the first person's negligence is not the proximate cause of the injury when there is an "efficient, intervening cause." Krause v. U.S. Truck Co., 787 S.W.2d 708, 710 (Mo. 1990). "If some injury is reasonably to be anticipated or is reasonably probable as a result of the defendant's act of negligence, then the added [negligent] act of a third person . . . does not break the chain of causation and defendant is liable; in such event the act of the third person is mere concurring negligence." Dickerson v. St. Louis Pub. Serv. Co., 286 S.W.2d 820, 824 (Mo. 1956). Here, Ken's negligence did not "interrupt[] the chain of events" set in place by William's negligence. See id. Ken's driving error occurred after he was surprised to see another vehicle on the bridge after William had told him that the bridge was clear. The entire sequence of events was set in motion by William's failure to stop Kyle Brown's car from driving onto the bridge, and the problem was exacerbated by the negligent warning he gave to Ken.

We conclude that there was sufficient evidence to support the jury's verdict that William Davis acted negligently and caused the death of Kyle Brown.

### III.

Appellants' final contention is that the district court erred by denying their motion for a new trial based upon what they allege was an improper comment in closing argument. When reviewing the denial of a motion for a new trial under Fed. R. Civ. P. 59(a), we give great deference to the district court's ruling and will not reverse in the absence of a clear abuse of discretion. Bass v. Gen. Motors Corp., 150 F.3d 842, 845 (8th Cir. 1998). "The key question is whether a new trial should have been granted to avoid a miscarriage of justice." Id. (quoting McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400 (8th Cir. 1994)).

Appellants claim that they were biased by the Browns' attorney's rebuttal statement that the defendants had agreed that although the Brown family had sustained damages of $700,000, "I think Kyle was worth more than that." After appellants moved to strike, the district court told the jury to disregard the comment. Then appellants moved for a mistrial which was denied. Appellants renewed their argument that the comment was prejudicial in their post verdict motion for a new trial.

The propriety of a statement in closing argument is a procedural question which we review under federal law. Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 285 (8th Cir. 1995). District courts have considerable discretion to control closing arguments, and we will not reverse unless counsel has made statements that were "plainly unwarranted and clearly injurious." Id. (quoting Vanskike v. Union Pac. R.R., 725 F.2d 1146, 1149 (8th Cir. 1984)). The Browns asked for a verdict of $8.5 million. Counsel for Ken Davis stated that the evidence

showed $700,000 of damages and told the jury, "So, give them $700,000." Counsel for William and WDL said he agreed with that calculation. Those statements opened the door for the allegedly prejudicial statement by the counsel for the Browns. See Crouch v. Teledyne Continental Motors, Inc., 511 F. App'x 822, 824 (11th Cir. 2013) (per curiam) (concluding that defendant's comments in opening and closing arguments were not reversible error where plaintiffs opened the door to the allegedly improper references). Moreover, the statement at issue was not unwarranted given the context, nor was it clearly injurious since the court instructed the jurors to disregard it. We conclude that the district court did not abuse its discretion in denying appellants' motion for a new trial.

IV.

For these reasons we affirm the judgment of the district court.

_____