# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3876
_____

Jesse Ventura, also known as James G. Janos

*Plaintiff - Appellee*

v.

Taya Kyle, as Executor of the Estate of Chris Kyle

*Defendant - Appellant*

------------------------------

33 Media Companies and Organizations; The First Amendment Scholars; Thomas
More Law Center

*Amici on Behalf of Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 20, 2015
Filed: June 13, 2016

_____

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

RILEY, Chief Judge.

Before his death, Chris Kyle was a sniper for a United States Navy Sea, Air and Land (SEAL) team.[1] He authored the book American Sniper: The Autobiography of the Most Lethal Sniper in U.S. Military History (American Sniper). In the book, Kyle described punching a "celebrity" referred to as "Scruff Face" who was making offensive remarks about the SEALs at a gathering following the funeral of a SEAL killed in combat. In interviews about the book, Kyle revealed "Scruff Face" was James Janos, better known as Jesse Ventura. Ventura, who was at the bar but denied a fight occurred, sued Kyle in this diversity action[2] under Minnesota law for defamation, misappropriation, and unjust enrichment, alleging Kyle fabricated the incident. The jury found in favor of Ventura on the defamation claim, awarding $500,000 in damages, and found in Kyle's favor on the misappropriation claim. Serving in its advisory role as to the equitable unjust-enrichment claim, the jury recommended an award of approximately $1.35 million, which the district court adopted. Kyle appeals the district court's denial of his motion for judgment as a matter of law or a new trial. Having jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and remand, in part.

## I.    BACKGROUND

The alleged altercation underlying this action occurred at McP's, a bar in Coronado, California, where Kyle and some friends were gathered in October 2006 after the funeral of a fellow SEAL. According to Kyle,

> Scruff started running his mouth about the war and everything and anything he could connect to it. President Bush was an asshole. We were only over there [Iraq] because Bush wanted to show up his father. We

---

[1]Kyle was killed in 2013 and his wife Taya Kyle, as executor of his estate, was substituted as the defendant. We continue to refer to the defendant in this case as "Kyle."

[2]See 28 U.S.C. § 1332(a)(1).

were doing the wrong thing, killing men and women and children and murdering. . . .

Scruff said he hates America.

Kyle approached Scruff and asked him to "cool it." "You deserve to lose a few," Scruff replied. Kyle was "calm," but Scruff swung at him. Kyle "laid him out. Tables flew. Stuff happened. Scruff Face ended up on the floor. [Kyle] left."

On January 4, 2012, the day after his book was released, Kyle was interviewed on a radio program and the television program "The O'Reilly Factor" to promote the book. During the radio interview, one of the hosts said there was a caller on the line who was saying Kyle was "in a bar fight with Jesse [Ventura]," a political commentator who formerly served as the Governor of Minnesota and in the Navy special forces. When asked if this was true, Kyle confirmed it was. During the television interview later that day, host Bill O'Reilly asked Kyle, "[Y]ou say you knocked Jesse Ventura to the floor with a punch. Now, you don't mention his name, but everybody knows who that is. . . . [T]hat happened?" Kyle again confirmed he "knocked him down." In the interviews, Kyle described the events similarly to the way he did in the book, adding that after he punched Ventura, "I took off running, because the cops were already outside. . . . [C]ops were watching, they saw the whole thing happen."

Kyle's editor described the publicity resulting from Kyle's radio interview as "priceless" in an email, and Kyle's publicist agreed the publicity response was "HOT, hot, hot!" The book was by all accounts a success. In 2014, Kyle's editor testified 1.5 million copies had been sold.

After the interviews, Ventura sued Kyle for defamation, misappropriation, and unjust enrichment on the grounds that Kyle fabricated the entire interaction with Ventura. Kyle moved for summary judgment on Ventura's claims of misappropriation and unjust enrichment, emphasizing he had "provided the Court

with case after case, all rejecting these types of . . . claims in the context of expressive works." The district court denied the motion.

At the close of discovery, Kyle moved for summary judgment on all claims. The district court concluded Kyle was not entitled to summary judgment on Ventura's defamation claim because "Ventura has proffered sufficient evidence upon which a jury could conclude that Kyle's statements [in the book] were materially false." The district court noted there were conflicting eyewitness accounts of the alleged incident, and photos of Ventura from the following day showed no visible injuries. The district court also rejected Kyle's rehearsed motion as to the misappropriation and unjust-enrichment claims.

The case was tried in summer 2014, almost eight years after the alleged altercation. Ventura testified he had a normal evening without any verbal or physical altercation. Three people who were with him that evening also testified they witnessed no altercation. However, these people were not in Ventura's immediate vicinity for the entire evening, and one testified he was hard of hearing.

Ventura also introduced evidence Kyle told different versions of the story. For example, in the book, Kyle alleged Ventura took the first swing, but he did not mention that in his interviews. Kyle mentioned in the interviews, but not the book, that the police saw the whole incident. Ventura produced a letter from the Coronado police department stating there was no police record mentioning Ventura's or Kyle's name. Ventura introduced photos of himself at a graduation event the day after the alleged incident that show no obvious injuries, despite Kyle having written "rumor has it he showed up at the BUD/S graduation with a black eye."

The jury watched part of Kyle's video-recorded deposition recounting his version of the evening's events. Kyle also presented several witnesses who were at the bar that evening, who testified they either heard Ventura make the alleged

-4-

comments, witnessed some type of physical altercation, or both.  All of Kyle's witnesses were current or former SEALs or friends or family of SEALs.

At least seven witnesses testified they overheard some of Ventura's remarks, and offered generally similar accounts of what Ventura said.  At least seven witnesses testified they saw Kyle (or an unidentified man, for those who did not know Kyle) punch Ventura; saw Ventura on the ground or getting up off the ground; or heard a "commotion" or "yelling."  Witness estimates of the timing and location of the incident were not consistent.

When questioned on cross-examination, Ventura agreed he had previously made controversial comments such as, "More and more we're seeing an Army run by Christianist extremists and an accompanying cadre of what can only be described as neo-Nazis."

Two witnesses from HarperCollins, American Sniper's publisher, also testified at trial.  Sharyn Rosenblum, HarperCollins's publicist for Kyle's book, testified about the general process of preparing the book for publication and said she did not know who "Scruff Face" was when she read the manuscript of the book, and did not ask. She testified she did not see the "Scruff Face" subchapter as relevant to her publicity campaign for the book but she wanted to focus on "the themes of the war, military service, love of country, [and] the patriotism to serve one's country."  She was "surprise[d]" when Ventura's name came up in Kyle's interview.  When asked whether "the Ventura story ha[d] any impact on the success of the book," Rosenblum replied it was "a very insignificant part" and did not impact the book's success. Kyle's editor, Peter Hubbard, testified the "Scruff Face" story was not relevant to his decision to enter into a book contract with Kyle.  Hubbard indicated he never suggested incorporating that subchapter into HarperCollins's marketing campaign for the book.  He characterized the "mention of Jesse Ventura" as having a "negligible" effect on the success of the book.

Ventura's counsel sought to impeach the HarperCollins witnesses by questioning them about Kyle's and HarperCollins's insurance coverage to show HarperCollins had "a direct financial interest in the outcome of th[e] litigation" and the witnesses were biased in favor of Kyle. See Fed. R. Evid. 411 (permitting questioning about insurance coverage to show a witness's bias). Kyle's counsel objected to this testimony prior to its introduction, but the district court allowed it. See Fed. R. Evid. 403 (providing that otherwise admissible evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice").

Ventura's counsel asked Rosenblum, "[A]re you aware that the legal fees for the estate's attorneys . . . are being paid by the insurance company for HarperCollins?" and "Are you aware that HarperCollins has a direct financial interest in the outcome of this litigation because they are providing the insurance?" Rosenblum denied knowledge of HarperCollins's insurance policy. Ventura's counsel asked Hubbard if he knew about any insurance provisions in Kyle's contract with HarperCollins. He said he did not. Kyle's counsel moved for a mistrial after both inquiries. The district court denied both motions.

Then, during closing arguments, Ventura's counsel opined:

> Sharyn Rosenblum testified that she did not know her company's *insurer is on the hook if you find that Jesse Ventura was defamed*. Both her and Peter Hubbard also testified that they do not know that their company's insurer was paying for the defense of this lawsuit. But they are not the disinterested, unbiased witnesses they were put in front of you for you to believe. It's hard to believe that they didn't know about the insurance policy because it's right in Kyle's publishing contract. Paragraph 6.B.3. of Exhibit 82, *Chris Kyle is an additional insured for defamation* under the publisher's insurance policy.

-6-

Kyle's counsel did not object in front of the jury, but moved again for a mistrial due to the insurance references once the jury was excused. The district court again denied the motion. Kyle's counsel did not ask for a curative instruction and the district court did not give one.

The jury struggled to reach a verdict. At noon on the fourth full day of deliberations, the jury reported they could not reach a unanimous decision. The district court instructed the jury to continue deliberating, yet they could not reach a verdict that day. The next morning the parties consented to permitting a 9-1 decision, but to no avail. The jury ultimately reached an 8-2 verdict on the fifth full day of deliberations. The jury found for Ventura on the defamation claim, made an advisory recommendation in Ventura's favor on the unjust-enrichment claim, and found for Kyle on the misappropriation claim. The jury awarded damages of $500,000 for defamation and recommended damages of approximately $1.35 million for unjust enrichment. The district court adopted the jury's recommendations as to the unjust-enrichment claim and accompanying damages award.

Among other assigned errors we need not reach, Kyle moved for judgment as a matter of law or a new trial, contending the jury was incorrectly instructed about the falsity element of defamation, the actual-malice requirement applicable in public figure defamation cases, and the applicable burdens of proof.[3] Kyle argued the

[3]The jury instruction on the elements of defamation described the basis for the defamation claim as follows: "Plaintiff Jesse Ventura claims that Chris Kyle defamed him by asserting in American Sniper, as well as on television and radio, that Mr. Ventura said 'he hates America,' the SEALs 'were killing men and women and children and murdering,' and the SEALs 'deserve to lose a few.'" The jury was then instructed that Ventura was required to prove the "story" was "defamatory" and "materially false" and Kyle "published the story knowing it was false, believing it was false, or having serious doubts about its truth."

unjust-enrichment judgment violated Minnesota law and the First Amendment and Ventura did not prove the amount he was enriched.  Finally, he sought a new trial on the grounds that the jury's "awards were tainted by the admission of prejudicial testimony and argument regarding [Kyle's] insurance."  The district court denied Kyle's motion.  Kyle appeals.

We vacate the defamation judgment and damages award and remand that claim for a new trial.  We further reverse the unjust-enrichment judgment, and vacate the accompanying damages award.[4]

## II.    DISCUSSION
### A.    Defamation Claim
The district court may grant a new trial on all or some issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or . . . after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court."  Fed. R. Civ. P. 59(a)(1)(A), (B).  We review the district court's denial of a new trial "for a 'clear abuse of discretion.'"  Behlmann v. Century Sur. Co., 794 F.3d 960, 963 (8th Cir. 2015) (quoting Burris v. Gulf Underwriters Ins. Co., 787 F.3d 875, 878 (8th Cir.

---

During deliberations, the jury asked, "when referring to Mr. Ventura's story (Punching Out Scruff Face) is the 'story' the sub-chapter or the 3 lines? ('he hates America,' 'we[']re killing men & women and children and murdering,' 'deserve to lose a few')."  Over Kyle's objection, the district court responded, "'The story,' as used in [the instructions] refers to the statements Mr. Kyle made about Mr. Ventura in the Punching Out Scruff Face subchapter and on television and radio, which include the three statements identified in your question. You are instructed to consider each element . . . as to the story as a whole."  Kyle argues these instructions were contradictory and leave unclear the basis for the defamation judgment, but we do not reach this assigned error because we conclude a new trial is warranted on other grounds.

[4]We need not decide Kyle's other assignments of error.

2015)). Kyle argues he is entitled to a new trial because the district court clearly abused its discretion by permitting Ventura to ask questions that put prejudicial information before the jury and to invoke Kyle's insurance in closing argument.

Initially, we reject Ventura's assertion Kyle waived any objection to the insurance testimony and argument because he did not object to the admission of his publishing agreement, which states, "Author will be named as an additional insured under the terms of any insurance policy that Publisher *may* carry which covers the cost of claims." (Emphasis added). In the event the jury analyzed the lengthy publishing contract's fine print and learned Kyle *may* have had insurance, this evidence alone would not permit Ventura's counsel to argue to the jury that an insurance policy including Kyle actually existed and the "insurer is on the hook." See, e.g., City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749, 758 (6th Cir. 1980) ("[W]hile mention of the contractually-mandated insurance may have been inevitable, it was prejudicial error for counsel for the City to inject into the trial the idea that Kiewit had insurance which would cover any damages the defendant would be obliged to pay."). Counsel's argument would have been improper and prejudicial, even if the jury already was aware of an insurance policy. See id. The record presented to this jury contained no evidence establishing an insurance policy covering Kyle, which makes Ventura's counsel's argument more improper and prejudicial.

We next consider the insurance testimony elicited from the HarperCollins employees. At trial, Ventura's counsel asked Rosenblum whether she was aware Kyle's attorneys were "being paid by the insurance company for HarperCollins" and "HarperCollins has a direct financial interest in the outcome of this litigation because they are providing the insurance." Ventura's counsel asked Hubbard whether he was "aware of any insurance provision in [HarperCollins's] contract [with Kyle]" and inquired "you obtain insurance coverage in the case when an author may get sued for libel or defamation, correct?" These questions assumed facts never in evidence—an insurance policy purchased by HarperCollins that covered Kyle, and Kyle's attorneys

-9-

were paid by the insurer. Both witnesses denied awareness of any insurance policy. Kyle's counsel objected to this questioning before Ventura's counsel's cross-examination, tried to object at the time, and moved for a mistrial after each witness testified. The district court permitted this cross-examination, by which Ventura's counsel ostensibly sought to show the HarperCollins witnesses were biased in favor of Kyle because HarperCollins and Kyle were covered by the same insurance policy.

Rule 411 of the Federal Rules of Evidence prohibits the introduction of insurance evidence to prove whether a person acted wrongfully but permits it for other purposes, such as proving a witness's bias. For example, we have permitted the use of evidence of insurance to show bias where a defense witness was employed by the defendant's insurance company. See, e.g., Charter v. Chleborad, 551 F.2d 246, 248 (8th Cir. 1977) (per curiam); see also 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5367 (1st ed. 1980) ("The paradigm case for use of evidence of insurance to show bias is in the cross-examination of a claims adjuster or insurance company doctor.").

Other "economic tie[s]" may "influence the witness to favor the insurance company," including "ownership of stock in the company, or a promise of employment, or a promise to pay the witness directly for his testimony." Wright & Graham, supra § 5367 (footnotes omitted).

> A majority of jurisdictions addressing this issue have applied a "substantial connection" analysis in order to balance the probative value and potential prejudice . . . . The substantial connection analysis looks to whether a witness has "a sufficient degree of connection with the liability insurance carrier to justify allowing proof of this relationship as a means of attacking the credibility of the witness." These courts have rejected a mere "commonality of insurance" approach, holding that the likelihood of bias is so attenuated that the risk of prejudice substantially outweighs the probative value.

-10-

Bonser v. Shainholtz, 3 P.3d 422, 425 (Colo. 2000) (quoting Otwell v. Bryant, 497 So. 2d 111, 114 (Ala. 1986)) (finding a "substantial connection" between an expert witness and the defendant's insurance company where the defendant and the expert witness were both members of a small insurance trust for dentists, "the expert witness had cofounded the trust," payments of claims "could result in a rise in premiums charged to all members," and "all members would be required to absorb a share" of any judgment exceeding the amount in the trust); cf. Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice.").

Here, there is no evidence Rosenblum and Hubbard had any economic tie or "substantial connection" to HarperCollins's insurance carrier. They were not currently or formerly employed by the insurance company, seeking employment with the insurance company, paid for their testimony by the insurance company, or holders of stock in the insurance company. See Wright & Graham, supra § 5367. There was no risk Rosenblum and Hubbard might personally contribute to the payment of any judgment in favor of Ventura. Ventura even failed to show a judgment in his favor could adversely affect Rosenblum's and Hubbard's employment with HarperCollins.

As a matter of basic evidentiary foundation, Ventura never established by direct evidence or reasonable inference that Rosenblum and Hubbard even knew about any insurance coverage or possible insurance payment. Rosenblum and Hubbard had no personal knowledge on the topic and were not qualified to testify on the subject. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

Ventura's counsel argued in closing, "It's hard to believe that [Rosenblum and Hubbard] didn't know about the insurance policy because it's right in Kyle's

-11-

publishing contract." The one-line mention of insurance contained in the lengthy small-print contract merely acknowledges HarperCollins "*may* carry" insurance. (Emphasis added). The publishing contract does not establish HarperCollins actually purchased insurance, much less that Rosenblum and Hubbard knew about it.

It is difficult to envision how Rosenblum and Hubbard could have been biased or even influenced by an insurance policy of which they were unaware. Even if they had been aware of a policy, any "connection" they had to the insurance carrier was far too remote to create a risk of bias strong enough to outweigh the substantial prejudice of Ventura's counsel's pointed and repeated references to unproven insurance.[5] See Fed. R. Evid. 403.

---

[5]The district court also concluded Taya Kyle "opened the door to [questions about insurance] by testifying about the financial impact of this litigation and her use of the book's proceeds," so-called "poor mouthing," Weiss v. La Suisse, Société D' Assurances Sur La Vie, 293 F. Supp. 2d 397, 413 (S.D.N.Y. 2003). We respectfully disagree.

Taya Kyle only testified on redirect examination about her use of the book's proceeds after Ventura's counsel had cross-examined her about how much of the proceeds she had donated, insinuating she was insufficiently generous. Kyle's counsel attempted to rebut this insinuation by asking Taya Kyle whether "this lawsuit had any impact upon what you have done with the proceeds from American Sniper?" and "Would you be able to pay the Plaintiff?" We also note the district court correctly rejected Ventura's "poor-mouthing" argument only the day before, explaining in an order, "Taya Kyle's testimony did not open the door to evidence of insurance because her testimony was accurate—the insurance policy covers only the defamation claim, not unjust enrichment or misappropriation, and thus proceeds from American Sniper are at risk, as she testified." It also is confusing how Taya Kyle's purported "poor-mouthing" "opened the door" to the cross-examination of *other* witnesses about HarperCollins's insurance policy, particularly witnesses so disconnected and with no personal knowledge on the subject. Cf. Fed. R. Evid. 602.

-12-

We now consider Ventura's counsel's statement during closing argument that HarperCollins's "*insurer is on the hook if you find that Jesse Ventura was defamed*" and "*Kyle is an additional insured for defamation under the publisher's insurance policy.*" (Emphasis added). As noted already, what insurer? What insurance policy?[6]

Ventura suggests Kyle's counsel did not "timely object[] during closing." We are not convinced Kyle's counsel's motion for a mistrial as soon as the jury was excused was necessarily untimely. See Lange v. Schultz, 627 F.2d 122, 127 (8th Cir. 1980) ("'[C]ounsel must either make an objection or . . . move for a mistrial at the time of the alleged misconduct, or where it involves a closing argument, counsel . . . should[] make his objection, take his exception, or ask for remedial action at the close thereof and before the case is submitted to the jury.'" (quoting Thomson v. Boles, 123 F.2d 487, 495-96 (8th Cir. 1941) ("[N]o exception to [the closing] remarks was taken by the defendant either during the argument *or at its close.*" (emphasis added)))). However, Ventura did not object at trial to the timeliness of Kyle's motion for mistrial made after closing and instructions. The district court likewise did not question the motion's timeliness and instead ruled on the motion's merits, a general topic on insurance admissibility raised before, during, and at the end of trial. Ventura's timeliness argument now is itself untimely.[7]

---

[6]From our review, these unsupported, improper, and prejudicial statements were not heat of the moment argument, but were strategic and calculated.

[7]The dissent concludes the district court did not err in denying Kyle's motion for mistrial because the motion made "after the retirement of the jury was untimely." Post at 23. The district court did not deny the motion because it was untimely. What is untimely is Ventura's timeliness argument on appeal—not preserved in the district court—and it should not be addressed in the first instance on the appeal of this case. See, e.g., Wever v. Lincoln County, Neb., 388 F.3d 601, 608 (8th Cir. 2004) ("Ordinarily, this court will not consider arguments raised for the first time on appeal.").

-13-

When deciding whether to grant a new trial due to improper remarks by counsel, we consider whether: (1) "the remarks in question 'were . . . minor aberrations made in passing'"; (2) the district court took "'specific curative action'"; and (3) "'the size of the damage award . . . suggest[s] that counsel's comment had a prejudicial effect.'" Gilster v. Primebank, 747 F.3d 1007, 1011-12 (8th Cir. 2014) (quoting Whittenburg v. Werner Enters. Inc., 561 F.3d 1122, 1131-32 (10th Cir. 2009)). "'[T]he weight of the evidence' is another relevant factor in determining 'whether the improper argument deprived a party of a fair trial.'" Id. at 1013 (quoting Stollings v. Ryobi Techs., Inc., 725 F.3d 753, 760 (7th Cir. 2013)).

Although relatively brief, Ventura's counsel's closing remarks about insurance "'were not minor aberrations made in passing.'" Id. at 1011 (quoting Whittenburg, 561 F.3d at 1131). Given Ventura's repeated efforts to introduce evidence of HarperCollins's and Kyle's insurance at trial, it is difficult to see how Ventura's counsel's comments were anything other than "a deliberate strategic choice" to try to influence and enhance damages by referencing an impersonal deep-pocket insurer. Id. ("[W]e cannot say that this improper argument [counsel's vouching and sympathy-arousing personal experience] 'did not accomplish the purpose which it was clearly intended to accomplish, namely, the enhancement of damages.'" (quoting Whittenburg, 561 F.3d at 1132-33)); cf. Indamer Corp. v. Crandon, 217 F.2d 391, 394 (5th Cir. 1954) (noting "defendant consistently sought to inject into the case the fact that the plaintiff had been protected by insurance"); Altenbaumer v. Lion Oil Co., 186 F.2d 35, 36 (5th Cir. 1950) (per curiam) (observing references to insurance were "continuously brought" to the jury's attention, which was a "gravely prejudicial error" necessitating a new trial).

Second, the jury did not receive a specific curative instruction, only the general reminder that "arguments of counsel are not evidence." Gilster, 747 F.3d at 1012 (determining the "reminder that counsel's arguments are not evidence" was an insufficient curative instruction, particularly where the court overruled the

-14-

defendant's contemporaneous objection).  But see Jones v. Nat'l Am. Univ., 608 F.3d 1039, 1048-49 (8th Cir. 2010) (citing "the district court's admonition to the jury prior to closing arguments that statements made by the attorneys are not evidence" as one factor supporting the decision to deny a new trial under the plain error standard).

Third, the jury awarded Ventura $500,000 in damages, which is probably "'not beyond the bounds of rationality.'"  Gilster, 747 F.3d at 1012 (quoting Whittenburg, 561 F.3d at 1132).  Yet, as was the case in Gilster, "we cannot say that th[e] improper argument 'did not accomplish the purpose which it was clearly intended to accomplish, namely, the enhancement of damages.'"  Id. (quoting Whittenburg, 561 F.3d at 1132-33).

Fourth, this was a close case that could have "go[ne] either way."  Id. at 1013.  After five days of deliberations, the jury could only reach an 8-2 verdict.  Although there was extrinsic evidence suggesting the falsity of Kyle's assertions that he punched Ventura and police witnessed that altercation arising from the alleged statements, the trial essentially was a credibility contest between Ventura, Kyle, and their respective eyewitnesses.

Finally, the risk of prejudice is high.  In Halladay v. Verschoor, 381 F.2d 100, 112 (8th Cir. 1967), we explained it was "utterly repugnant to a fair trial or . . . a just verdict" for the jury to hear that "the damages sued for . . . will be taken care of by an insurance . . . company."  We observed that "it has been almost universally held that the receipt of such evidence constitutes prejudicial error sufficient to require reversal."  Id.; cf. Transit Cas. Co. v. Transamerica Ins. Co., 387 F.2d 1011, 1013-14 (8th Cir. 1967) ("The fact that [the plaintiff] was reinsured and stood to bear only five percent of [its] loss is a fact that obviously would impress the jury, and might well lead it to return a defendant's verdict . . . [and] [t]he interjection of the issue of reinsurance was prejudicial error.").

In light of this precedent, we must conclude Ventura's counsel's closing remarks, in combination with the improper cross-examination of two witnesses about Kyle's insurance coverage, prevented Kyle from receiving a fair trial. The district court clearly abused its discretion in denying a new trial. See, e.g., Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 188 (7th Cir. 1993) ("Collectively, . . . [the errors] presented the jury such a skewed picture that the verdict is unreliable and must be set aside."); Malek v. Fed. Ins. Co., 994 F.2d 49, 55 (2d Cir. 1993) (reversing judgment because "[a]lthough each of the erroneous evidentiary rulings . . . , standing alone, may be insufficient to justify reversal, we cannot say that the cumulative effect is harmless"). But see SEC v. Infinity Grp. Co., 212 F.3d 180, 196 (3d Cir. 2000) (rejecting cumulative error doctrine for civil cases). We remand the defamation claim for a new trial.[8]

## B.    Unjust-Enrichment Claim

Kyle argues the unjust-enrichment judgment is inconsistent with Minnesota law and would be prohibited by the First Amendment even if it did comport with Minnesota law. Kyle also asserts "Ventura presented no competent evidence Kyle was enriched." We agree Kyle was not unjustly enriched as a matter of Minnesota law, so we do not consider Kyle's constitutional arguments or review the district court's factual findings.[9]

---

[8]We note the complications that can arise when a general verdict form is used in public-figure defamation cases. See, e.g., Greenbelt Co-op. Pub. Ass'n v. Bresler, 398 U.S. 6, 11 (1970); West v. Media Gen. Operations, Inc., 120 F. App'x 601, 602, 619 (6th Cir. 2005) (unpublished) (collecting cases).

[9]The district court concluded Kyle forfeited any challenge to the unjust-enrichment judgment because Kyle filed a motion for judgment as a matter of law with the district court under Federal Rule of Civil Procedure 50, which governs issues tried to a jury, not Federal Rule of Civil Procedure 52, which governs actions tried without a jury or with an advisory jury. The district court stated that, even if it were to treat Kyle's motion as a Rule 52 motion, Rule 52 applies only to factual findings,

Under Minnesota law, "to prevail on a claim of unjust enrichment, a claimant must establish an implied-in-law or quasi-contract in which the defendant received a benefit of value that unjustly enriched the defendant in a manner that is illegal or unlawful." Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 838 (Minn. 2012). We agree with Kyle that "Ventura cannot maintain a claim for unjust enrichment because he had no pre-existing contractual or quasi-contractual relationship with Kyle." See id. ("We have limited the application of unjust enrichment to claims premised on an implied or quasi-contract between the claimant and the party alleged to be unjustly enriched.").

Although Ventura is correct that "[a] quasi-contract will be imposed" where "a benefit was conferred unknowingly or unwillingly," we reject Ventura's assertion that Ventura conferred a "benefit" on Kyle by Ventura's mere existence as a colorful figure who might inspire people to make up stories about him. Galante v. Oz, Inc., 379 N.W.2d 723, 725-26 (Minn. Ct. App. 1986). Ventura's unjust-enrichment claim is not allowed by Minnesota law.

---

whereas Kyle raised legal arguments.

We cannot agree with the district court's conclusion that Kyle improperly attempted to "advance new theories" in his motion for judgment as a matter of law because he waited until after the trial to argue that equitable remedies such as unjust enrichment are not available when adequate legal remedies exist. Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1219 (5th Cir. 1986). Kyle raised this point in his trial brief. He also raised several arguments for why Ventura's unjust-enrichment claim failed as a matter of law in both of his motions for summary judgment, his trial brief, and his reply trial brief. See Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 715-16 (8th Cir. 2008) (finding a "lengthy footnote" in the plaintiff's brief in opposition to the defendant's motion to amend its answer was "sufficient to avoid waiver on appeal"). On the record in this case, we conclude Kyle has preserved the issue.

-17-

Furthermore, even if Ventura had proven the other elements of unjust enrichment, the equitable remedy would still not be available because "'there is an adequate remedy at law available'" for public figures—money damages for defamation.[10]  Bame, 721 F.3d at 1030 (quoting ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 305 (Minn. 1996)).  The district court concluded Ventura's legal remedy was inadequate because:

> damages available to [Ventura] on his defamation claim were limited to those necessary to remedy the injury to his reputation. . . . [T]he jury was expressly advised—*at [Kyle's] behest*—that it could *not* award additional damages for unjust enrichment if it found that [Ventura's] "damages award for defamation . . . provide[d] him with an adequate remedy". . . . [Ventura's] defamation claim provided him with no means to obtain the disgorgement of [Kyle's] ill-gotten gains . . . . [Ventura's] legal remedy was inadequate to fully ameliorate [Kyle's] wrongful conduct, and the defamation claim did not preclude the unjust-enrichment claim as a matter of law.

(Fifth insertion in original).

This conclusion was erroneous.  First, whether there is an adequate remedy at law is a question of law, not a factual question for the jury.  ServiceMaster of St. Cloud, 544 N.W.2d at 305.  The jury, not aware of the legal/equitable distinction, likely would have interpreted "adequate" to mean "enough money."  Even if the adequacy of the legal remedy were a proper question for the jury, we note the inconsistency in the jury's verdict.  The jury determined $500,000 would "fairly and adequately" compensate Ventura for Kyle's defamation, but then suggested an award

---

[10]The unjust-enrichment award cannot be based on Ventura's misappropriation claim because, although Ventura did not prevail, an adequate legal remedy was *available.*  Cf. United States v. Bame, 721 F.3d 1025, 1031-32 (8th Cir. 2013).

of approximately $1.35 million for unjust enrichment, which required the jury to find the opposite—that the defamation award was an inadequate remedy.

Second, as a matter of law, adequate legal remedies were available. Neither the district court nor Ventura cited any case awarding profits in a defamation case under an unjust-enrichment theory, or even suggesting money damages are an inadequate remedy in a public-figure defamation case. We find none. Cf. Silvercorp Metals Inc. v. Anthion Mgmt. LLC, No. 150374/2011, 2012 WL 3569952, at *12 (N.Y. Sup. Ct. Aug. 16, 2012) (unreported) ("[T]he factual allegations supporting Silvercorp's unjust enrichment claim are identical to those giving rise to the defamation claim [and merge into the defamation claim]."). In one of the few cases addressing the issue, a New York state trial court observed:

> Libel has been [a] field of much litigation in both England and this country. . . . [I]t is significant that in none of these cases has an action such as is brought by the plaintiff in this case been instituted. The plaintiff recognizes this fact and states: "We are undertaking to prove additional facts never before pleaded in a libel suit, namely, that the defendant had and received money by virtue of his libellous publication." The absence of attempts to bring an action similar to the instant one is evidence of the recognition by the legal profession and the courts that such an action would not lie under the common law.

Hart v. E.P. Dutton & Co., 93 N.Y.S.2d 871, 879 (N.Y. Sup. Ct. 1949); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 23 (1990) ("[I]mperfect though it is, *an action for damages* is the *only* hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored." (emphasis added) (quoting Rosenblatt v. Baer, 383 U.S. 75, 93 (1966) (Stewart, J., concurring))); Cason v. Baskin, 20 So. 2d 243, 254 (Fla. 1944) (en banc). In Minnesota, the defamation action generally applies to all "claims that arise as a consequence of . . . purported defamatory statements." Mahoney & Hagberg v. Newgard, 729 N.W.2d 302, 310 (Minn. 2007).

-19-

We cannot accept Ventura's unjust-enrichment theory, because it enjoys no legal support under Minnesota law. Ventura's unjust-enrichment claim fails as a matter of law.

## III. CONCLUSION

We reverse the unjust-enrichment judgment and vacate and remand the defamation judgment for a new trial.

SMITH, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's reversal of the unjust-enrichment judgment. *See supra* Part II.B. However, I disagree with majority's decision to vacate and remand the defamation judgment for a new trial because of references to insurance in trial testimony and closing argument. *See supra* Part II.A.

In an eleven-day trial, the subject of insurance arose on the second day following the testimony of Taya Kyle ("Taya")—Kyle's widow. Ventura's counsel asked the court "to address . . . the admissibility of the insurance policy that's applicable here" in light of Taya's testimony "that she's had to pay the expenses associated with this litigation"; "that if she gives the money away to charity, that she wouldn't be able to pay a judgment; and that if she gave the money away, she may not be able to feed her children as a result of this litigation." Ventura's counsel argued that courts addressing this issue "have found that this is an instance where an insurance policy should, in fact, be admitted to counteract testimony that is clearly inaccurate." Ventura's counsel explained that when presented with the "opportunity to do recross on Ms. Kyle, [he] plan[ned] to ask her about whether there is an insurance policy that, in fact, covers the legal expenses and will pay a judgment, because that is the case." Ventura's counsel sought "permission to raise the issue of insurance" in light of Taya purportedly opening the door to the subject. The court reserved ruling on the admissibility of insurance pending briefing from the parties.

-20-

On the seventh day of trial, the court heard argument outside of the jury's presence concerning the admissibility of insurance. Ventura's counsel again argued that Taya should not be permitted to "'plead poverty if an insurance company is going to pick up the tab.'" But Ventura's counsel conceded that the insurance policy covered *only* the defamation claim, not the misappropriation and unjust-enrichment claims. In a written order, the district court denied Ventura's motion to question Taya regarding the insurance policy. The court concluded that "Taya Kyle's testimony did not open the door to evidence of insurance because her testimony was accurate—the insurance policy covers only the defamation claim, not unjust enrichment or misappropriation, and thus proceeds from *American Sniper* are at risk, as she testified."

Undaunted, the next day, Ventura's counsel acknowledged the court's ruling but made an offer of proof to preserve the issue for appellate review. Ventura's counsel proceeded to attempt to introduce, as part of that offer of proof, the insurance policy. "And related to that matter," Ventura's counsel asked the court's permission to "inquire [pursuant to Rule 411] as to the existence of insurance" with Rosenblum and Hubbard, HarperCollins representatives, because of those witnesses' purported "direct financial interests in this litigation" as representatives of the insured party. The court again reserved ruling on the issue. When the court raised the issue later in the day, Kyle's counsel reiterated that the witnesses were "not affected by any insurance coverage at all" and that "if HarperCollins or th[ese] witness[es] were direct defendants, the introduction of any evidence regarding insurance would be just as off limits as it is against Mrs. Kyle. It would be completely inappropriate to delve into the question of insurance here." The court overruled Kyle's counsel's objection and permitted the inquiry, although it explained that the inquiry would not "be lengthy or in detail."

Thereafter, Ventura's counsel asked Rosenblum whether the witness was "aware that the legal fees for the estate's attorneys . . . are being paid by the insurance

company for HarperCollins." Rosenblum answered no. Ventura's counsel then asked whether Rosenblum was "aware that HarperCollins has a direct financial interest in the outcome of this litigation because they are providing the insurance." Rosenblum again answered no. During a sidebar conference, Kyle's counsel moved for a mistrial based on the "introduction of the insurance testimony." The district court denied the motion.

Ventura's counsel subsequently asked Hubbard, whether "you obtain insurance coverage in the case when an author may get sued for libel or defamation." Hubbard responded, "I don't know about that." Kyle's counsel objected based on relevance, and the court overruled the objection. Ventura's counsel then inquired whether the witness was "aware of any insurance provisions in [Kyle's publishing] contract." Kyle's counsel again objected based on relevance, and the court again overruled the objection. Hubbard answered, "I'm not aware."

On the final day of trial, during closing arguments, Ventura's counsel briefly highlighted[11] Rosenblum's and Hubbard's ignorance of an insurance provision in Kyle's publishing contract. Thereafter, the court orally instructed the jury. One of its general instructions was that "[q]uestions, objections, statements, and arguments of lawyers are not evidence in the case." The "[j]ury retired at 11:59 a.m." After dispensing with a couple routine matters, the court asked whether there was anything else that it needed to cover. At that point, Kyle's counsel moved for a mistrial based on Ventura's counsel's references to insurance in his closing argument. The district court denied the motion for mistrial. Court adjourned at 12:02 p.m.

---

[11]The district court permitted each side an hour for closing arguments. Ventura's counsel's closing argument covers approximately 30 pages of transcript.

Based on the record, I first conclude that the district court did not err in denying Kyle's motion for mistrial. Kyle's motion for mistrial after the retirement of the jury was untimely.

"When reviewing the denial of a motion for a new trial under Fed. R. Civ. P. 59(a), we give great deference to the district court's ruling and will not reverse in the absence of a clear abuse of discretion." *Brown v. Davis*, 813 F.3d 1130, 1138–39 (8th Cir. 2016) (citation omitted). We will reverse the district court's denial of a motion for new trial "only to prevent a miscarriage of justice." *Behlmann*, 794 F.3d at 963 (quotation and citation omitted). Likewise, we "will not disturb a trial court's denial of a motion for mistrial absent a clear showing of abuse of discretion." *Warger v. Shauers*, 721 F.3d 606, 609 (8th Cir. 2013) (quotation and citation omitted). Here, the district court's denial of the mistrial motion was not an abuse of discretion.

The majority concludes that "[w]e are not convinced Kyle's counsel's motion for a mistrial *as soon as the jury was excused* was untimely." *See supra* Part II.A (emphasis added) (citing *Lange*, 627 F.2d at 127 (citing *Thomson*, 123 F.2d at 495–96)). *Lange* provides that "'counsel must either make an objection or . . . move for a mistrial at the time of the alleged misconduct, or where it involves a closing argument, counsel . . . should[] make his objection, take his exception, or ask for remedial action at the close thereof and *before the case is submitted to the jury*.'" 627 F.2d at 127 (emphasis added) (quoting *Thomson*, 123 F.2d at 495–96 ("[N]o exception to [the closing] remarks was taken by the defendant either during the argument or at its close.")).

The record shows that Kyle's counsel failed to make his motion for mistrial "before the case [was] submitted to the jury." *See id.* at 127. Here, the record clearly shows that the court gave oral instructions to the jury and that, after that charge, the "[j]ury retired at 11:59 a.m." Thus, the case was already "submitted to the jury" at 11:59 a.m. *before* Kyle's counsel moved for a mistrial based on improper closing

argument. For that reason, I conclude that no timely objection was made. *See Lange*, 627 F.3d at 127.[12]

Second, I do agree with the majority that the district court erred in permitting Ventura's counsel's questions to HarperCollins's witnesses regarding insurance under Rule 411. The record contains no evidence that "Rosenblum and Hubbard had any economic tie or 'substantial connection' to HarperCollins's insurance carrier" and "Ventura never established by direct evidence or reasonable inference that Rosenblum and Hubbard even knew about insurance coverage or possible insurance payment." *See supra* Part II.A. But the district court's error does not automatically render a new trial necessary. "Rule 411 does not deal with the standard for reversal," which is an abuse of discretion. 23 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5369 (1980) (citing, *inter alia*, *Church Ins. Co. v. Trippe Mfg. Co.*, 250 F. App'x 420, 422 (2d Cir. 2007) (abuse of discretion); *King v. Harrington*, 447 F.3d 531, 533 (7th Cir. 2006) (abuse of discretion)). In fact, "some courts have found minor violations of Rule 411 to be 'harmless error.'" *Id*. (citing *Nguyen v. Myers*, 442 S.W.3d 434, 440 (Tex. Ct. App. 2013)).

---

[12]Although Ventura did not object to Kyle's motion for mistrial based on untimeliness, "we may affirm [the district court's denial of the motion for mistrial] for any reason supported by the record, even if different from the reasons given by the district court." *Robins v. Becker*, 794 F.3d 988, 992 (8th Cir. 2015) (quotation and citation omitted); *see also Emery v. Am. Airlines, Inc.*, No. 15-10100, 2016 WL 1425939, at *3 (11th Cir. Apr. 12, 2016) ("Because the district court issued a summary order, it is not apparent from the face of the order that the motion was denied as untimely. We nevertheless may affirm the district court's decision for any reason supported by the record, even if not relied upon by the district court." (citation omitted)).

This interpretation is given some support by a former member of the Advisory Committee who has argued that reversals for violations of Rule 411 be limited "to those instances of gross mi[s]conduct in which counsel has made a deliberate and apparently successful attempt to prejudice the jury." In other words, reversal is required only when the injection of insurance has resulted in an excessive verdict.

*Id*. (footnotes omitted).

After reviewing the record, I conclude that any error in allowing Ventura's counsel to inquire about insurance was, at most, harmless and non-prejudicial. First, Ventura's counsel asked a total of four questions about insurance to two witnesses who disclaimed any knowledge about the subject during the course of an eleven-day trial. Second, the inquiry about insurance came *after* Taya first testified that she would be responsible for paying the judgment—at least as to the misappropriation and unjust-enrichment claims—were Ventura to prevail. Thus, the jury was on notice that Taya would be responsible for paying at least part of any judgment rendered against Kyle. Third, the issue of insurance did not permeate the entire trial; instead, in addition to the four questions asked of the HarperCollins witnesses, the only other references to insurance were the two statements in Ventura's counsel's hour-long closing argument. Fourth, the $500,000 in damages on the defamation claim is not an excessive verdict; as even the majority concedes, the verdict "is probably not beyond the bounds of rationality." *See supra* Part II.A. (quotations and citations omitted).

For these reasons, I conclude that the district court did not abuse its discretion in denying Kyle a new trial on the defamation claim.[13]

––––––––––––––––––––––––––––––

[13]Because the majority vacates and remands the defamation judgment for new trial based on the references to insurance in trial testimony and closing argument, the majority does not address Kyle's additional arguments that Kyle is entitled to a new trial on the defamation claim because the district court failed to instruct the jury that Ventura had to prove material falsity by clear and convincing evidence and Ventura failed to establish actual malice. On remand, these issues will likely be raised again. Out of an abundance of caution, I decline to issue an advisory opinion on the merits of these questions.